IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

SADAWN LATREASE SMITH,                )
    Plaintiff,                                      )
                                                           )
v.                                                          )       Case No. 2:13-cv-01783-JEO
                                                           )
CAROLYN W. COLVIN                      )
Acting Commissioner of Social Security, )
    Defendant,                                    )

## MEMORANDUM OPINION

      Plaintiff, Sadawn Latrease Smith, brings this action pursuant to 42 U.S.C. § 405(g), seeking review of the final decision of the Acting Commissioner of Social Security ("Commissioner") denying Plaintiff's application for disability insurance benefits under Title II of the Social Security Act and for Supplemental Security Income Benefits ("SSI"). (R. 24). This case has been assigned to the undersigned United States Magistrate Judge pursuant to this court's general order of reference. The parties have consented to the jurisdiction of this court for the disposition of the matter. (Doc. 10). *See* 28 U.S.C. § 636(c), FED. R. CIV. P. 73(a). Upon review of the record and the relevant law, the undersigned finds that the Commissioner's decision is due to be affirmed.

### I. Procedural History

      Plaintiff filed applications for disability insurance benefits under Title II of the Social Security act and for SSI on March 23, 2011. (Doc. 11 at 1). These applications were initially denied. (*Id.*) Afterwards, she requested a hearing before an Administrative Law Judge ("ALJ"), which was held on May 14, 2012. (R. 35-68).[1] The ALJ denied disability benefits to Plaintiff on June 27, 2012, concluding that Plaintiff did not have an impairment or combination of impairments

---

[1] References herein to "R. ___" are to the administrative record located at Document 8 (Answer of the Commissioner).

listed in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1420(d), 404.1525, 404.1526, 416.920(d), 416.915 and 416.926). (R. 23-4). The Appeals Council declined to grant a review of the ALJ's decision on July 25, 2014. (R. 1-5). Plaintiff then field this action for judicial review pursuant to § 205(g) and § 1631(c)(3) of the Social Security Act, 42 U.S.C. § 405(g) and § 1383(c)(3). (Doc. 1).

## II. Standard of Review

In reviewing claims brought under the Social Security Act, this court's role is a narrow one. "Our review of the Commissioner's decision is limited to an inquiry into whether there is substantial evidence to support the findings of the Commissioner, and whether the correct legal standards were applied." *Wilson v. Barnhart*, 284 F.3d 1219, 1221 (11th Cir. 2002); *see also Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988). The plaintiff must demonstrate that the decision of the Commissioner is not supported by substantial evidence. *See, e.g. Allen v. Schweiker,* 642 F.2d 799 (5th Cir. 1981). "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Winschel v. Commissioner of Social Sec.* 631 F.3d 1176, 1178 (11th Cir. 2011)(internal quotations and citations omitted). The court gives deference to factual findings and reviews questions of law de novo. *Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991). The court "may not decide the facts anew, reweigh the evidence, or substitute [its] judgment for that of the [Commissioner], rather [it] must scrutinize the record as a whole to determine if the decision reached is reasonable and supported by substantial evidence." *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir 1990) (quoting *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1982))(internal quotations and other citations omitted). As noted above, conclusions of law made by the Commissioner are reviewed de novo. *Cornelius,* 936 F.2d at 1145. Accordingly, "[n]o … presumption of validity attaches to the [Commissioner's]

conclusions of law." *Wiggins v. Schweiker*, 679 F.2d 1387, 1389 (11th Cir. 1982).

### III. Discussion

**A. Facts**

Plaintiff was 37 years old at the time of her hearing and has a college degree. (R. 40). At 37, Plaintiff is considered a "younger person" according to 20 C.F.R. §§ 404.1563(c) and 416.963(c). Plaintiff's past relevant work experience is as an operations manager with Wal-Mart. (R. 62). Plaintiff contends she has been unable to engage in substantial gainful activity since June 1, 2008, after being placed on extended leave by her employer subsequent to filing a discrimination lawsuit. She claims she became unable to work due to bipolar disorder, major depressive disorder, anxiety disorder, and borderline personality traits. (R. 22). Plaintiff testified during her hearing before the ALJ that she is unable to work due to these conditions, and that any stress causes her to be off-balance, unable to think, and have racing thoughts. (R. 41).

Since May 2008, Plaintiff has been to multiple hospitals and medical centers to seek treatment for her mental health issues. (R. 253). On May 20, 2008, Plaintiff submitted to inpatient treatment for paranoid thoughts after she was referred by an emergency room physician to psychiatrist Dr. Armand Schachter.[2] (*Id.*) Her initial assessment at the hospital indicates that she was alert, fully oriented, very pleasant, had good eye contact, normal speech, logical and coherent though process, fine mood and stable affect, good insight, judgment, and cognition, and no psychomotor agitation, harmful ideation, or psychosis. (R. 245-47, 249, 253). She had an assigned

---

[2] Plaintiff believed that "Wal-Mart, the IRS, and other big companies were out to get her ant that she was at the end of her rope." (R. 25).

Global Assessment of Functioning Score ("GAF")[3] of 10[4] upon admission. (R. 247). Plaintiff's brain MRI was unremarkable, and she responded well to the environment and medication. Dr. Schachter discharged her to go home approximately three weeks later with an assigned GAF of 90, indicating absent or minimal symptoms. (R. 245). *See* American Psychiatric Ass'n., *Diagnostic and Statistical Manual of Mental Disorders*, 4th Edition ("DSM-IV").

After her discharge, Plaintiff continued seeing Dr. Schachter. However, her visits were sporadic. (R. 238-39, 260-67). Plaintiff went to the emergency room for unrelated issues in June and September 2008. She did not complain of any mental symptoms. (R. 421-431).

At some point, she discontinued her medications against her doctor's advice. This resulted in her being hospitalized on March 27, 2009, for complaints of depression and suicidal thoughts. (R. 238). The notes from Plaintiff's intake indicate that she had suicidal thoughts, "loosening of associations," and "pressure of speech," but she was alert and oriented. (R. 242). Her GAF was assessed at 10. (R. 238). Within a week after admission, Dr. Schachter noted Plaintiff's condition had improved, and she had no harmful ideation or psychosis. (R. 239-42). She was discharged by Dr. Schachter who again assigned a GAF of 90. (R. 237). She was diagnosed as being bipolar, with mixed exacerbation with psychotic features in remission, and general anxiety disorder. (*Id*.)

In a June 4, 2009 visit, Plaintiff reported a good, stable mood. Dr. Schachter's office recommended continuing her current medication. (R. 258).

---

[3] "The GAF is a 100–point scale divided into 10 numerical ranges, which permits clinicians to assign a single-ranged score to a person's psychological, social, and occupational functioning. *Keyes–Zachary v. Astrue*, 695 F.3d 1156, 1162 n. 1 (10th Cir.2012) (citing Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders 32, 34 (Text Revision 4th ed. 2000))." *Stone v. Comm'r of Soc. Sec*., — F. App'x—, 2014 WL 4784117, *2, n.2 (11th Cir. Sept. 26, 2014).

[4] A GAF Score at 10 or below indicates persistent danger of severely hurting self or others (e.g., recurrent violence) or persistent inability to maintain minimal personal hygiene or serious suicidal act with clear expectation of death. *See* DSM-IV.

Plaintiff became pregnant in early 2010, and gave birth in September 2010. (R. 381-82, 400). In March 2011, when Plaintiff sought emergency room care for depression, she had been off her medication for over a year due to her pregnancy, but reported no prior suicide attempts and was alert, fully oriented, and had normal speech, mood, and affect and was released home in a stable condition with a prescription for Zoloft. (R. 278-83, 413-16).

On May 19, 2011, Dr. Samuel Saxon, a licensed clinical psychologist, conducted a consultative examination on Plaintiff. (R. 304-06). He noted she was not on psychotropic medication, but was still prescribed Zoloft. (R. 304). He also noted that while she was "hyper," she exhibited no borderline personality traits and displayed less intellect and cognitive skills than her record and work history would suggest. Dr. Saxon attributed this to mental symptoms which would likely improve upon returning to her "ideal" treatment. (R. 306-07). Dr. Saxon did not mention how Plaintiff's symptoms would affect her ability to do work-related activities, but assessed an approximate GAF of 45.[5] (*Id.*)

On May 24, 2011, state agency consulting psychologist Dr. Cryshelle Patterson examined the record and concluded that Plaintiff would "benefit from a flexible schedule and would be expected to miss 1-2 days of work per month due to psychological symptoms, … would benefit from regular rest breaks and a slowed pace, but would still be able to maintain an acceptably constant work pace." (R. 324).

Plaintiff was seen at Cooper Green Hospital Clinic by Dr. Sharin Banu on July 25, 2011. During her physical assessment, Plaintiff reported that she last used Zoloft two weeks earlier. (R.

---

[5]A GAF Score of between 41 and 50 indicates serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). *See* DSM-IV.

341). She was referred by Dr. Banu to the psychiatric clinic for her bipolar disorder. (*Id.*)

At an emergency room visit on August 25, 2011, concerning complaints of abdominal pain, Plaintiff did not report any anxiety or depression. She was alert and not in distress. (R. 351-52).

On November 9, 2011, Plaintiff stated during her intake session at the Eastside Mental Health Clinic that she wanted to get back on her medication although she was still breast feeding her daughter. (R. 438). She denied harmful ideation, displayed above average intelligence, normal speech, appropriate appearance, mood, and affect. (R. 438-39, 443-44). Plaintiff's therapist assigned a GAF of 60, representing moderate symptoms.[6] (R. 445).

About the same time, on November 8, 2011, Plaintiff was seen at Kirkland Clinic regarding fibroid tumors found during her pregnancy. (R. 331). It was noted during intake that her mood and affect were appropriate and that she was oriented and cooperative. (R. 333). It was also noted that she had been diagnosed with depression, and that she "self-discontinued" her medications years ago. (R. 334). She was prescribed medication for her tumors. It was reported on April 4, 2012, that she never filled her prescription for the tumor medication. (R. 463).

Plaintiff stopped breast-feeding in December 2011, and resumed taking the medications prescribed by psychiatrist Dr. Badari Birur for her depression, anxiety and sleep problems. (R. 450). Later in December, Plaintiff sought care in the emergency room for anxiety and depression, but was alert and oriented with normal and appropriate speech, mood, and affect. She was released to go home in stable condition with a prescription. (R. 344-48).

In February 2012, Plaintiff received inpatient treatment for a week after reporting suicidal

---

[6]More specifically, a GAF between 51 and 60 indicates moderate symptoms (*e.g.*, flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (*e.g.*, few friends, conflicts with peers or coworkers). *See* DSM-IV.

6

ideation and plans, failure of her medications to curb her mental symptoms, and inability to care for her child.  (R. 359-61, 373).  Her GAF score was 30[7] upon admission.  (R. 359).  She was evaluated as pleasant and fully oriented during exam, although irritability was noted.  (*Id*.)  Plaintiff responded to treatment, and at discharge one week later was deemed to be le` She was alert and oriented.  (R. 407-08).

At a subsequent visit with Dr. Badari Birur in April 2012, Plaintiff denied harmful ideation and was described as having appropriate rapport and attention, average intellect, goal directed thoughts, and fair insight and judgment.  (R. 453-55).  Dr. Birur described her as dysphoric–anxious and depressed.  (R. 454).  He recommended Plaintiff continue her current medications, including Prozac and Vistaril for six additional months.  (R. 456).

**B. Analysis**

   **1. Did the ALJ Fail to Properly Evaluate the Medical Evidence of Record From Examining Source, Dr. Saxon, and Reviewing Source, Dr. Patterson?**

Plaintiff initially asserts that the ALJ did not properly evaluate the opinion of Dr. Saxon. Specifically, she contends that the ALJ did not give enough weight to Dr. Saxon's opinion that there was "some interference from her mental illness and to her daily affairs at this point in her life…" and Dr. Saxon's assessment of a GAF of 45.  (Doc. 11 at 7 (citing R. 306-07)).  She notes that "a GAF score of 50 or below is indicative of 'serious symptoms or ... serious impairment in social, occupation, or school functioning.'"  (*Id*. at 8 (citing DSM-IV at 32).  Accordingly, she concludes that the ALJ "should have found her disabled due to the severity of her psychological based

---

[7] A GAF Score of between 21 and 30 indicates behavior influenced by delusions or hallucinations or serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) or inability to function in almost all areas (e.g., stays in bed all day; no job, home or friends).  *See* DSM-IV.

restrictions." (*Id*. at 8). The Commissioner responds that the ALJ properly assessed Plaintiff's Residual Functioning Capacity ("RFC"). (Doc. 13 at 12). The contentions will be addressed in reverse order.

First, Plaintiff's reliance on one GAF score as the threshold for serious symptoms is misplaced. A GAF score alone is not dispositive of a claimant's functional abilities or RFC, as it is merely a subjective rating reflecting the patient's functioning at the time of the examination and does not lead to a specific mental limitation or indicate a claimant's ability in spite of mental limitations. *See Williams v. Comm'r of Soc. Sec.*, 580 F. App'x 732, 734 (11th Cir. 2014); 20 C.F.R. §§ 404.1545(a), 416.945(a) (defining RFC). Furthermore, a GAF is not due any special weight, nor is it determinative in any step of the ALJ's sequential evaluation. *See e.g.*, *Nye v. Comm'r of Soc. Sec.*, 524 F. App'x 538, 545 (11th Cir. 2013) (rejecting argument that GAF of 42 showed serious impairments); *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 511 (6th Cir. 2006) (recognizing a GAF in the 40s "may have little or no bearing" on social and occupational functioning); *Wilkins v. Barnhart*, 69 F. App'x 775, 780 (7th Cir. 2003) (rejecting argument that GAF of 40 was inconsistent with finding that Plaintiff could work).

Second, Plaintiff's challenge to the ALJ's conclusion that "Dr. Saxon did not provide any clear functional limitations in his report, his findings and opinions are given partial weight" is without merit. (Doc. 11 at 8 (citing R. 26)). Plaintiff asserts this is a failure on the part of the ALJ to properly weigh the evidence. (*Id*. at 7). She contends that Saxon's opinion is supported by the above-noted GAF score and the medical review of state agency psychologist Dr. Patterson who concluded that Plaintiff "would be expected to miss 1-2 days of work per month due to psychological symptoms." (*Id*. at 9 (citing R. 320, 324)). The Commissioner retorts that the ALJ did not substitute his judgment for that of the medical experts, "but instead ... carried out his

regulatory duty of assessing Plaintiff's RFC based on the evidence." (Doc. 13 at 12).

Medical opinions alone cannot determine Plaintiff's disability. Such determinations are administrative findings reserved for the Commissioner. *See* 20 C.F.R. §§ 404.1527(d), 416.1527(d). The ALJ must consider, along with the medical opinions, the medical source's examining relationship with the claimant, evidence supporting the relevant opinion, and the opinion's consistency with the record as a whole. *See* C.F.R. §§ 404.1527(c), 416.927(c).

In this case, Dr. Saxon only examined Plaintiff once, and Dr. Patterson did not examine her at all. (R. 304-325). Given the time expended on review of Plaintiff as compared to other medical providers and the other evidence, the opinions of Dr. Saxon and Dr. Patterson were given appropriate weight and not the weight given to treating source opinions. *See* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2) (stating that the opinion of a treating source is given controlling weight when well supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with other substance evidence of rec ord); *Hickel v. Comm'r of Soc. Sec.*, 539 F. App'x 980, 989 (11th Cir. 2013) (noting a non-examining source's opinion is accorded little weight if it contradicts an examining source's opinion).

The substantial evidence on record from Dr. Schachter, an examining physician, shows that Plaintiff, while undergoing treatment and taking her medicine, recovered to a functioning GAF of 90. (R. 245). A GAF of 90 indicates an absence of, or minimum amount of symptoms. *See* DSM-IV. The record shows that Plaintiff was hospitalized twice with a GAF of 10. Following treatment and a medication regime, she improved at discharge in each instance with a GAF of 90. Specifically, upon her hospitalization in May 2008, she was assigned a GAF score of 10. Dr. Schachter discharged her to go home approximately three weeks later with a GAF of 90, indicating absent or minimal symptoms. (R. 245). When Dr. Schachter required additional in-patient

treatment for Plaintiff in March 2009 after suicidal thoughts and loosening associations, she improved almost immediately with treatment and was discharged about a week later with a GAF of 90. (R. 237-242). There are also instances in the record where Plaintiff stopped taking her medicine and went to the emergency room (*e.g.* June and September of 2008) for unrelated issues, but did not complain of mental health symptoms. (R. 238-39, 260-67, 421-31). In June 2009, she had a good, stable mood and only reported having a short temper, and was advised to continue taking her current medication.[8] (R. 258).

      After becoming pregnant and giving birth in September 2010, Plaintiff stopped taking her medication, and although she went to the emergency room once in March 2011 for depression, all medical records (then and otherwise) indicate she showed no significant impairment and was neat, fully oriented, with good eye contact, normal speech, mood and effect. (R. 278-81, 304-05, 333, 350-53, 413-16, 438-39, 443-44, 453-55). Only once, in August 2009, was she assigned another GAF assessment indicating moderate symptoms (GAF of 60). (R. 445).

      The substantial evidence discussed above, and cited by the ALJ, supports the ALJ's finding that Plaintiff experienced, at most, moderate limitations. Thus, the ALJ appropriately determined that Plaintiff did not require schedule accommodations to perform full time work or that she would necessarily miss one to two days of work per month. (R. 23-24, 28). The ALJ, in his review of the record, including the medical evidence, found substantial evidence to conclude that Plaintiff did not require the time off as stated by Dr. Patterson and that the GAF score assessed by Dr. Saxon was not dispositive of Plaintiff's ability to work. Given the substantial body of contrary evidence from

---

[8]Plaintiff's unwillingness to continue her medication was also evidenced in her father's Third Party Function Report when he stated that "[s]he refuse[s] to take med. at time[s] because she say[s] she do[es] not need them." (R. 195).

Drs. Schachter, Banu and Birur and the medical records, the ALJ did not improperly weigh the opinions of Drs. Saxon and Patterson.

Plaintiff's protestations that "Dr. Patterson's opinion, contrary to the ALJ's assertion, is consistent with the medical records and the opinion of Dr. Saxon" and that "[i]n discrediting these significant and well-supported opinions, the ALJ seems to be selectively choosing evidence from the record and substituting his opinion to the detriment of Plaintiff," are simply not enough to warrant a finding that the ALJ committed error. (Doc. 11 at 9). This claim is without merit.

### 2. Did the ALJ Place Undue Emphasis Upon Plaintiff's Reported Activities of Daily Living?

Plaintiff next argues that the ALJ placed undue emphasis on her reported activities of daily living, and wrongfully used them to deny her disability claim. (Doc. 11 at 12). She concludes that her "limited activities are not what would be expected of a viable work candidate and certainly do not demonstrate that Plaintiff is capable of work activity." (*Id*.) The Commissioner retorts that the ALJ properly assessed Plaintiff's credibility concerning her subjective complaints. (Doc. 13 at 15).

When a claimant attempts to establish disability based in part on subjective complaints of symptoms, she must first produce: (1) evidence of an underlying medical condition and (2) objective medical evidence either (a) confirming the severity of alleged symptoms, or (b) indicating the medical conditions could be reasonably expected to cause symptoms as severe as alleged. *See* 20 C.F.R. §§ 404.1529, 416.929; *Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002). If objective medical evidence does not confirm the severity of the alleged symptoms, but indicates one could reasonably expect the claimant's impairment to produce those symptoms, the ALJ must evaluate the persistence and intensity of the claimant's alleged symptoms on their ability to work. *See* 20 C.F.R. §§ 404.1529(c)(1), 416.929(c)(1); *Wilson* at 1225-26. Because Plaintiff did not

objectively prove her claims solely with medical evidence, the ALJ must determine the credibility of the intensity, persistence, and limiting effect of claimant's alleged symptoms. *Wilson*, 284 F.3d at 1225. To determine this, the ALJ must consider the claimant's *daily activities*; the symptoms' location, duration, frequency, and intensity; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of medication taken to alleviate the symptoms; treatment, other than medication; any other measures used to relieve the symptoms; and any other factors concerning functional limitations and restriction due to the symptoms. *See* 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).

Here, the ALJ found that although Plaintiff's medically identified impairments could cause her alleged symptoms, her statements regarding the intensity, persistence and limiting effects of her symptoms are not fully credible. (R. 25, 28). The substantial medical evidence regarding the efficacy of treatment, when combined with Plaintiff's own statements about her personal daily activities, negate Plaintiff's allegation of a total inability to work. (R.25-28). Furthermore, Plaintiff's treating physician and father both claim Plaintiff would stop taking her medications at times because she said she did not need them. (R. 28. 195, 238-39).

The ALJ concluded that, because Plaintiff regularly performs household tasks such as cooking, cleaning, caring for her daughter and mother, shopping, and attending church, Plaintiff's level of disability is not that which she claims. (R. 23 & 28). Plaintiff's performance of household work is not in dispute. Plaintiff contends, however that undue emphasis has been placed on these facts. She further notes the Eleventh Circuit has stated that "participation in everyday activities of short duration, such as housework or fishing, [does not] disqualif[y] a claimant from disability…."

*Lewis v. Callahan*, 125 F.3d 1436, 1441 (11th Cir. 1997).[9] The Plaintiff, however, fails to note that in *Lewis* the Eleventh Circuit held that household work was not inconsistent with the limitations placed upon the claimant by the *treating* physician, and that there was no record evidence to support the ALJ's reliance on the consulting physicians over the treating physicians. *Id*. Finally, the court notes that an ability to do housework does not translate to a determination that Plaintiff is not disabled.

      Unlike *Lewis*, the ALJ reviewing Plaintiff's claim used the evidence of Plaintiff's daily activities along with the record evidence provided by the *treating* physicians as a whole and determined Plaintiff's RFC. He found no inconsistencies therein and accordingly rejected the opinions of the consulting physicians. (R. 28). Although an ALJ cannot use a claimant's daily activities, such as housework and shopping, to be the sole factor in determining a disability claim, an ALJ can use a claimant's daily activities combined with objective medical evidence and the other evidence on record to assess the credibility of a claimant's subjective claims. When reviewing the medical evidence on record from the treating physician, along with Plaintiff's statements and activities, the ALJ placed proper emphasis on Plaintiff's reported daily activities to determine the credibility of her allegations. His determination that Plaintiff had no more than mild limitation on performing her activities is supported by the record. Plaintiff's argument that "the ALJ's conclusion that Plaintiff's daily activities demonstrate she is not disabled is not supported by substantial evidence" and citation to the opinions of Dr. Saxon, Dr. Patterson, and the vocational expert is insufficient. (Doc. 11 at 13-14). This claim is without merit.

---

[9]In *Gude v. Sullivan*, 956 F.2d 791-95 (8th Cir. 1992), the Eight Circuit Court of Appeals stated that "even if Gude had the ability to do some housework in 1987 during one of her 'good days,' that is not necessarily inconsistent with her allegations of pain and disability at the time of the hearing."

IV.  Conclusion

The ALJ, in his review of the entirety of the record properly found substantial evidence to conclude that Plaintiff did not require the time off as determined by Dr. Patterson and that Dr. Saxon's temporary GAF score for Plaintiff was not indicative of Plaintiff's ability to work. Furthermore, the ALJ did not place undue emphasis on Plaintiff's self-reported daily activities, when taken in conjunction with the reports by her treating physician and father, to determine her limitations on daily activities as mild.  Thus, the undersigned finds that the Commissioner's decision is due to be affirmed.

**DATED**, this the 26th day of November, 2014.

_John E. Ott_

**JOHN E. OTT**
Chief United States Magistrate Judge